Boris Zelkind (SBN 214014)
E-mail: BZelkind@duanemorris.com
**DUANE MORRIS LLP**
865 South Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450
Telephone: (619) 744-2267
Facsimile: (619) 923-2283

Christopher M. Champine (SBN 323385)
E-mail: CMChampine@duanemorris.com
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, California 92101-4681
Telephone: (619) 744-2200
Facsimile: (619) 744-2201

Attorneys for Plaintiff
POLYPEPTIDE LABORATORIES, INC.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POLYPEPTIDE LABORATORIES, INC., a Delaware corporation,<br><br>  Plaintiff,<br><br>  v.<br><br>BRANT ZELL, an individual; AMBIOPHARM, INC., a California corporation,<br><br>  Defendants. | Case No.: 2:19-cv-08820<br><br>**PLAINTIFF POLYPEPTIDE LABORATORIES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Complaint Filed: October 14, 2019 |

DM2\10535634.2

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1
I. INTRODUCTION ................................................................................. 1
II. STATEMENT OF FACTS .................................................................... 2
    A. PolyPeptide and Its Trade Secrets .............................................. 2
    B. Defendants and the Theft of PolyPeptide's Trade Secrets ......... 3
III. ARGUMENT ........................................................................................ 4
    A. Legal Standard ............................................................................. 4
    B. Each of the Four Factors Weighs in PolyPeptide's Favor ......... 6
        1. PolyPeptide Meets Either of the Variants of the Temporary Injunction Standard ............................................................. 6
        2. PolyPeptide Will Suffer Irreparable Harm if a Temporary Restraining Order is Not Granted ....................................... 8
        3. The Balance of Equities Weighs Heavily in PolyPeptide's Favor ................................................................................. 10
        4. Issuing a Temporary Restraining Order against AmbioPharm and Zell is in the Interest of the Public ........................... 11
IV. GOOD CAUSE EXISTS FOR WAIVING EX PARTE NOTICE ....... 12
V. CONCLUSION ................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Alliance For The Wild Rockies v. Pena*,
 865 F.3d 1211 (9th Cir. 2017) ................................................................................ 5

*Alta Devices, Inc. v. LG Elecs., Inc.*,
 343 F. Supp. 3d 868 (N.D. Cal. 2018) ................................................................ 6-7

*Amylin Pharm., Inc. v. Eli Lilly & Co.*,
 456 F. App'x 676 (9th Cir. 2011) ........................................................................... 8

*Ariz. Dream Act Coal. v. Brewer*,
 757 F.3d 1053 (9th Cir. 2014) ............................................................................... 8

*Cadence Design Sys., Inc. v. Avant! Corp.*,
 125 F3d 824 (9th Cir. 1997) ................................................................................ 10

*Colo. River Indian Tribes v. DOI*,
 2015 U.S. Dist. LEXIS 182548 (C.D. Cal. June 11, 2015) ................................... 5

*CTIA - Wireless Ass'n v. City of Berkeley*,
 854 F.3d 1105 (9th Cir. 2017) ............................................................................. 11

*De Vico v. United States Bank*,
 2012 U.S. Dist. LEXIS 155622 (C.D. Cal. Oct. 29, 2012) ................................. 10

*Guzman v. Shewry*,
 552 F.3d 941 (9th Cir. 2009) ................................................................................. 5

*Immigrant Assistant Project of Los Angeles County Fed'n of Labor v. INS*,
 306 F.3d 842 (9th Cir. 2002) ................................................................................. 6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v.* Chung,
 01-CV-00659 CBM RCX, 2001 WL 283083 at *6 (C.D. Cal. Feb. 2, 2001) ...................................................................................................................... 12

*Ossur hf v. Manamed Inc.*,
 331 F. Supp. 3d 1005 (C.D. Cal. July 20, 2017) ................................................. 10

*Small v. Avanti Health Sys., LLC*,
 661 F.3d 1180 (9th Cir. 2011) ............................................................................... 8

*Softketeers, Inc. v. Regal West Corp., et al.*,
 SACV 19-00519 JVS (JDEx), 2019 WL 4418819 at * 10 (C. D. Cal.
 May 6, 2019) .................................................................................................... 10

*Stormans, Inc. v. Selecky*,
 586 F.3d 1109 (9th Cir. 2009) ................................................................. 5, 10, 12

*WeRide Corp. v. Kun Huang*,
 379 F. Supp. 3d 834 (N.D. Cal. 2019) ............................................................. 6, 8-10

**Statutes**

18 U.S.C. § 1832 .................................................................................................... 12

18 U.S.C. §1836 ....................................................................................................... 6

18 U.S.C. § 1839(3) .............................................................................................. 6-7

18 U.S.C. § 1839(5) .................................................................................................. 7

**Rules**

Fed. R. Civ. P. 65 ............................................................................................. 4-5, 12

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

PolyPeptide manufactures peptides and peptide substances for use as active pharmaceutical ingredients. It is critical that PolyPeptide's manufactured molecules are in strict compliance with FDA regulations, and thus its manufacturing processes, quality control procedures, and quality assurance systems are the lifeblood of the company. PolyPeptide has spent years developing proprietary manufacturing techniques and quality systems and has taken great care to keep them confidential.

In what is becoming an all-too-common occurrence in this modern economy, an employee, on the eve of changing jobs and going to a competitor, downloaded and stole a library of confidential documents, containing PolyPeptide's trade secrets. Defendant Brant Zell, PolyPeptide's former Global Director of Quality Assurance, exported over 150 files from PolyPeptide's secure server onto his company issued laptop and then, days before terminating his employment, copied those files onto an external USB storage device. With PolyPeptide's trade secrets in-hand, Zell joined Defendant AmbioPharm, a competitor of PolyPeptide's, as Vice President of Quality.

PolyPeptide is acting quickly in hopes of preventing its trade secrets from being destroyed. If Zell and AmbioPharm are not allowed to use PolyPeptide's confidential and trade secret information in his new employment and are required to return the stolen documents, then irreparable harm may be avoided. Thus, PolyPeptide is seeking a temporary restraining order requiring Zell and AmbioPharm to return PolyPeptide's documents and to make certain that they do not use or disclose PolyPeptide's trade secrets.

///
///
///
///
///

DM2\10535634.2

1

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER ENJOINING DEFENDANTS BRANT ZELL AND AMBIOPHARM, INC.**

## II. STATEMENT OF FACTS

### A. PolyPeptide and Its Trade Secrets

PolyPeptide is a manufacturer of peptides and peptide related molecules. Peptides are used as active pharmaceutical ingredients to treat a number of conditions, including, but not limited to, cardiovascular conditions, metabolic diseases, cancer, and neurodegenerative disorders. Declaration of Jane Salik, ¶ 4.

In order to manufacture high quality, pharmaceutical-grade peptides, PolyPeptide spent years developing improved, proprietary manufacturing processes, quality control procedures, and quality assurance programs. For instance, PolyPeptide developed a unique, proprietary "Global Quality System," which includes a set of standard operating procedures ("SOPs") for producing, manufacturing and assuring the highest quality peptide and peptide substances. PolyPeptide's proprietary Global Quality System is designed to ensure consistent Current Good Manufacturing Practices ("cGMP") compliant with Food and Drug Administration ("FDA") regulations for Active Pharmaceutical Ingredients ("APIs"). Salik Decl., ¶¶ 8-9. PolyPeptide also developed validation reports and protocols containing confidential information about its manufacturing processes. *Id*, ¶ 10.

PolyPeptide has become one of the market leaders in peptide manufacturing. PolyPeptide is one of several entities within the PolyPeptide Group, a global peptide manufacturing organization. The PolyPeptide Group manufactures over one third of all approved peptide drug substances in the world (22 of 62 approved products worldwide), which accounts for over a quarter of the worldwide sales of outsourced peptide therapeutics. *Id*, ¶¶ 6-7.

PolyPeptide has gone to great lengths to maintain the secret nature of its proprietary quality control procedures, manufacturing processes, and quality assurance systems, including the Global Quality System, validation reports and protocols, and its SOPs ("PolyPeptide Confidential Information"). These measures include, but are not limited to, use of secure networks, implementation of a

2

sophisticated document management system called the Qumas System, restricting access to its facilities, requiring passwords throughout its network, use of non-disclosure and confidentiality agreements, and conducting employee background checks and specialized employee training. *Id.*, ¶¶ 11-12.

The confidentiality of the PolyPeptide Confidential Information is vital to PolyPeptide's success in the market and, if disclosed, would enable key competitors such as AmbioPharm to compete more effectively and take business from PolyPeptide. *Id.*, ¶ 13.

### B. Defendants and the Theft of PolyPeptide's Trade Secrets

Zell is the former Global Director of Quality Assurance for PolyPeptide. He was hired by PolyPeptide in June of 2011. As a condition of his employment, Zell was required to sign a "Confidentiality, Non-Competition, and Indemnity" agreement ("2011 Agreement"). *Id.*, ¶¶ 14-15, and Ex. A. Pursuant to the 2011 Agreement, Zell agreed that he would not use for his own benefit or otherwise divulge or disclose any of PolyPeptide's trade secrets and that "[a]ll files, records, computer printouts, documents, [and/or] specifications . . . whether prepared by [Zell] or otherwise coming into his possession, shall remain the exclusive property of PolyPeptide." *Id.*, Ex. A.[1]

While employed at PolyPeptide, Zell managed team functions such as quality agreements, supplier audits, batch record reviews, annual product reviews, compliance handling, document control systems, current good manufacturing practices, training of employees, and clinical and commercial product releases. Zell also worked closely with PolyPeptide's Regulatory Affairs, Manufacturing, Development, Marketing, and Corporate Quality sections on customer projects, regulatory submissions, and

---

[1] In 2019, PolyPeptide updated its Employee Handbook, which included a "Confidentiality and Non-Disclosure" section. This section reiterated Zell's confidentiality obligations, i.e., not to "disclose, or permit to be disclosed," "photocopy or duplicate," or "make any use of [PolyPeptide's trade secrets] for your own benefit or the benefit of any person or entity other than the Company …." Salik Decl., Ex. B. On June 3, 2019, Zell signed an acknowledgment, agreeing to be bound by the terms of the 2019 Employee Handbook. *Id.*

harmonizing quality standards. In order to perform his duties, Zell was granted access to the PolyPeptide Confidential Information. *Id*., ¶¶ 17-20. In the normal course of his duties, Zell would occasionally download one or two confidential documents from PolyPeptide's secure Qumas document management system, which contain PolyPeptide Confidential Information. Declaration of Roger Jonsson, ¶ 9.

Unlike his normal business activity, on June 28, 2019, Zell logged into PolyPeptide's secure Qumas system and exported one hundred and fifty eight (158) files from the Qumas system onto his company issued laptop computer. The exported files included most of PolyPeptide's library of confidential documents that described PolyPeptide's confidential SOPs, manufacturing processes, quality control procedures, quality assurance systems, the Global Quality System, and validation reports and protocols. *Id*., ¶¶ 7-8. On August 1, 2019, Zell connected an external USB storage device to the laptop and copied the library of documents containing PolyPeptide's Confidential Information onto the USB storage device. Declaration of Matthew Howard-Ramon. Zell moved these files over to the external USB device within two minutes. *Id*., ¶ 12, Ex. D.

August 15, 2019, was Zell's last day at PolyPeptide (Salik Dec., ¶21)—only two weeks after he copied the library of documents containing PolyPeptide's trade secrets onto an external USB storage device. On August 19, 2019, AmbioPharm announced that Zell had been hired as its Senior Vice President of Quality in the United States. Salik Decl., ¶23. Zell currently works at AmbioPharm's facility in North Augusta, South Carolina.

### III. ARGUMENT

#### A. Legal Standard

PolyPeptide is entitled to a temporary restraining order pursuant to Rule 65(b)(1), which states that the "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if . . . specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury,

4

loss, or damage will result to the movant before the adverse party can be heard in opposition; and . . . the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

The Ninth Circuit has articulated two variants of the same standard for temporary injunctive relief. *Alliance For The Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the traditional standard, courts review four factors in determining whether temporary relief is appropriate: (1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm in absence of a preliminary injunction or temporary restraining order; (3) whether the balance of equities tips in favor of the moving party; and (4) whether granting injunctive relief is in the public's interest. *Id.* See also *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

Under the "sliding scale" variant, "if a plaintiff can only show there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,'" and plaintiff can show there is a likelihood of irreparable injury and that the injunction is in the public interest. *Alliance For The Wild Rockies*, 865 F.3d at 1217 (emphasis in original). "At an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits or questions serious enough to require litigation." *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009). "Whether a claim on the merits is strong enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Colo. River Indian Tribes v. DOI*, 2015 U.S. Dist. LEXIS 182548, at *99 (C.D. Cal. June 11, 2015).

///

///

5
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION
FOR TEMPORARY RESTRAINING ORDER.

The two alternatives represent extremes of a single continuum rather than two separate tests. *Immigrant Assistant Project of Los Angeles County Fed'n of Labor v. INS*, 306 F.3d 842, 873 (9th Cir. 2002).

### B. Each of the Four Factors Weighs in PolyPeptide's Favor

#### 1. PolyPeptide Meets Either of the Variants of the Temporary Injunction Standard

##### a. *PolyPeptide is Likely to Succeed on the Merits*

Defendants acquisition of PolyPeptide's Confidential Information via Zell's theft of a library of confidential documents constitutes trade secret misappropriation in violation of the DTSA (18 U.S.C. §1836), and Zell is in clear breach of the 2011 and 2019 Agreements with PolyPeptide.

The PolyPeptide Confidential Information is the lifeblood of the company. Its proprietary manufacturing processes, quality control procedures, and quality assurance systems are what allow PolyPeptide to manufacture the highest-quality peptide molecules. These trade secrets ensure consistent Current Good Manufacturing Practices ("cGMP") compliant with FDA regulations for active pharmaceutical ingredients. PolyPeptide's innovations and know how have enabled it to supply active ingredients to over a quarter of the world's outsourced peptide therapeutics.

The DTSA defines a trade secret as "information that (1) derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable by other people who can obtain economic value from its disclosure or use and (2) is subject to reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845–46 (N.D. Cal. 2019); *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) Manufacturing processes and techniques can constitute trade secrets under the DTSA. *Id.* at 883.

///

///

PolyPeptide has implemented extensive measures to maintain the secrecy of the PolyPeptide Confidential Information, including, restricting access to the confidential information and its facilities, using a secure document management system that tracks access to and exportation of documents, using NDAs and CDAs, and training employees. The PolyPeptide Confidential Information is not readily ascertainable and has tremendous value from not being generally known by the public or PolyPeptide's competitors. Salik Decl., ¶¶ 9-11. Thus, the PolyPeptide Confidential Information meets the definition of a "trade secret" pursuant to 18 U.S.C. § 1839(3).

DTSA defines misappropriation as "(1) the [a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) the [d]isclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5); *Alta Devices, Inc. v. LG Elecs., Inc.*, at 877. Zell's theft of documents containing the PolyPeptide Confidential Information from PolyPeptide's secure Qumas document management system, is willful trade secret misappropriation.

Likewise, AmbioPharm's acquisition and use of PolyPeptide's trade secrets is misappropriation as defined by the DTSA. AmbioPharm knew or had reason to know that it acquired PolyPeptide's trade secrets through improper means. AmbioPharm knew or should have known that Zell was not authorized to take PolyPeptide's library of confidential documents containing its most critical trade secret information to his new employer. Among other benefits to AmbioPharm, the information Zell stole would allow AmbioPharm to access and replicate PolyPeptide's extraordinarily successful SOPs, protocols, and manufacturing and testing procedures, all of which have helped PolyPeptide to earn a reputation of reliability with its customers and a successful record securing FDA and cGMP approvals. AmbioPharm on the other hand has struggled to comply with FDA requirements. Salik Decl., ¶ 24. Accordingly, PolyPeptide is likely to succeed on the merits of its DTSA claim.

Additionally, PolyPeptide will likely prevail on its Breach of Contract claim. Zell is a party to the 2011 Agreement and the 2019 Agreement. These agreements prohibited Zell from taking or sharing PolyPeptide's confidential, proprietary information, including the information he took on August 1, 2019. See Salik Decl., Exs. A and B. Zell breached both the 2011 Agreement and the 2019 Agreement.

### b. *PolyPeptide Raises Serious Questions on the Merits*

As described above, PolyPeptide has demonstrated that it is likely to succeed on the merits of its trade secrets and contract claims. However, if this showing were not sufficient to establish a likelihood of success on the merits, at a minimum, it raises serious questions that go to the merits of this case. As such, discussion of the three factors below should lead the Court to preserve the status quo until the merits of the case can be heard.

### 2. PolyPeptide Will Suffer Irreparable Harm if a Temporary Restraining Order is Not Granted

"A district court cannot grant an injunction unless the movant has shown that irreparable harm is likely; the possibility of harm is insufficient to meet the movant's burden." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. Because intangible injuries generally lack an adequate legal remedy, intangible injuries may qualify as irreparable harm." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). A plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011).

Disclosure of trade secrets, such as a proprietary process or a competitor's technology, can constitute irreparable harm. *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853 (N.D. Cal. April 1, 2019). *WeRide* is particularly instructive to the case at bar. Therein, a software engineer used a USB drive to download 1,192 files

from a laptop issued to him by his employer, a technology company developing autonomous vehicles, before resigning from the company eight days later to work for a competitor and, allegedly, an affiliate. *Id.* at 844. The engineer subsequently deleted files from the laptop and wiped the hard drive of another computer issued to him by the company. *Id.* Weeks later, the software engineer appeared at an event on behalf of one of the technology company's competitors to exhibit certain autonomous vehicle technologies. *Id.* The technology company subsequently filed suit and a motion for preliminary injunction. *Id.* at 840-41.

In ruling on a preliminary injunction, the District Court ruled that the technology company was likely to suffer irreparable harm because the competitor's use of the company's trade secrets would give them an unfair advantage in the autonomous vehicle industry. *Id.* at 853. "Without an injunction, [the technology company] is likely to have its market position set back as [the competitors] receive an unfair boost." *Id.* "In trade secret cases, injunctions are appropriate to prevent this sort of unfair advantage." *Id.* (*citing Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

Likewise here, if AmbioPharm is allowed to use and implement PolyPeptide's trade secret manufacturing processes, quality control procedures and quality assurance systems, then PolyPeptide will suffer irreparable harm. PolyPeptide's competitor will get an unfair boost by using PolyPeptide's proprietary know how. Salik Decl., ¶ 25. This is especially true when AmbioPharm has struggled to meet FDA requirements on its own. Zell and AmbioPharm should not be allowed to profit from their wrongdoing. An injunction is the appropriate remedy to protect PolyPeptide's business.

Additionally, irreparable harm may occur if there is an increased risk of broader disclosure. *WeRide*, 379 F. Supp.3d at 853. For example, the software engineer in *WeRide* represented to the Court he worked with a team of engineers and one of the competitors represented it planned to hire 100 engineers. *Id.* "Without an injunction [the company's] trade secrets could be widely disclosed." *Id.* "A trade secret once

lost, of course, is lost forever." *Id.* Here, the risk of broader disclosure here is not only real, but clear and present. Zell's new job at AmbioPharm is nearly identical, to the role he left at PolyPeptide—overseeing testing, quality assurance, and ensuring timely cGMP and FDA approvals.

The threat of irreparable harm to PolyPeptide is imminent. Zell stole a library of documents containing PolyPeptide's most sensitive information and will use it to attempt to replicate and implement PolyPeptide's proven methods and systems at AmbioPharm. Defendants' use of PolyPeptide's Confidential Information will forever destroy the PolyPeptide's trade secrets. *See* Salik Decl., ¶ 25. The Court can prevent this broader disclosure of PolyPeptide's trade secrets with a temporary restraining order.

### 3. The Balance of Equities Weighs Heavily in PolyPeptide's Favor

"In assessing whether the plaintiffs have met this burden, the district court has a duty to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d at 1138. "The court must evaluate the interim harm the defendants are likely to sustain if the injunction is granted and compare it with the harm the plaintiff is likely to suffer if an injunction does not enter." *De Vico v. United States Bank*, 2012 U.S. Dist. LEXIS 155622, at *22 (C.D. Cal. Oct. 29, 2012).

Where trade secrets have been misappropriated, the issuance of a temporary restraining order is appropriate as the defendant should not be permitted to profit from his own wrongful act. *See, e.g., Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005, 1017 (C.D. Cal. July 20, 2017); *Softketeers, Inc. v. Regal West Corp., et al.*, SACV 19-00519 JVS (JDEx), 2019 WL 4418819 at * 10 (C. D. Cal. May 6, 2019). "Defendants cannot complain of the harm that will befall them when properly forced to desist from their infringing activities." *Ossur hf*, 331 F. Supp. 3d at 1017 (internal punctuations omitted); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F3d 824, 830 (9th Cir. 1997) (denying injunction was in error even though effect would be

"devastating" to defendant's business because plaintiff established a likelihood to succeed on merits of a copyright claim).

As described above, PolyPeptide stands to lose its trade secrets, which represent the lifeblood of the company. PolyPeptide's techniques and methods for manufacturing the highest-quality peptides on a consistent basis is what sets PolyPeptide apart from its competitors. PolyPeptide has spent years developing its trade secrets and building its business. PolyPeptide has implemented strong measures to maintain the secrecy of its trade secrets. It would be devastating to PolyPeptide to lose the competitive advantange it has spent years and countless hours building.

Moreover, the TRO sought by PolyPeptide is designed to preserve the status quo and have minimal impact on the Defendants. PolyPeptide is seeking to prevent Zell and AmbioPharm from using PolyPeptide's trade secrets and to return the stolen documents. PolyPeptide is not seeking to halt AmbioPharm's sales or product offerings. AmbioPharm can continue its business without using PolyPeptide's Confidential Information as if the theft had never happened. PolyPeptide is seeking to have AmbioPharm and Zell return the stolen information and put measures in place to prevent use of PolyPeptide's trade secrets. But, the TRO will have minimal impact on the defendants. In short, granting the Temporary Restraining Order would only, restrict AmbioPharm's access to information it should never have had in the first place, whereas denying the motion could, in a matter of only days or weeks, destroy PolyPeptide' trade secrets. The balance of harms weighs heavily in PolyPeptide's favor.

### 4. Issuing a Temporary Restraining Order against AmbioPharm and Zell is in the Interest of the Public

"The public interest inquiry primarily addresses the impact on nonparties . . . It embodies the U.S. Supreme Court's direction that, in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *CTIA - Wireless Ass'n v. City of Berkeley*,

854 F.3d 1105, 1124 (9th Cir. 2017).  "The plaintiffs bear the initial burden of showing that the injunction is in the public interest.  However, the district court need not consider public consequences that are highly speculative.  In other words, the court should weigh the public interest in light of the likely consequences of the injunction." *Stormans, Inc. v. Selecky*, 586 F.3d at 1139.

There is a strong public interest in favor of protecting trade secrets. *Merrill Lynch, Pierce, Fenner & Smith Inc. v.* Chung, 01-CV-00659 CBM RCX, 2001 WL 283083 at *6 (C.D. Cal. Feb. 2, 2001); *see also* 18 U.S.C. § 1832 (theft of trade secrets punishable by fine and treble damages).  Trade secret theft poses a threat to businesses of all types, including those in the business of manufacturing and selling peptide products.  All fifty states and the United Stated Congress have passed laws that punish individuals that steal trade secrets.  The public, through their elected representatives at both the state and federal levels, recognize that the ability to grow and maintain a business depends largely on the ability to protect the ways in which it operates and conducts business.  For manufacturers that do business in technologically advanced fields, secrecy is particularly important because each new development could be independently lucrative.  The public has a strong interest in preventing Zell and AmbioPharm from profiting from theft of PolyPeptide's trade secrets.

Accordingly, all four factors weigh in favor of PolyPeptide, and PolyPeptide is entitled to a TRO under either the traditional or sliding scale variant of the temporary injunctive relief standard.

## IV.   <u>GOOD CAUSE EXISTS FOR WAIVING EX PARTE NOTICE</u>

Pursuant to Fed. R. Civ. P. 65 (b), the Court may issue this temporary restraining order without written or oral notice to the adverse parties.  As described in the Salik declaration, immediate and irreparable injury will result if the Defendants are not enjoined.  *See* Salik Decl., ¶ 25.  As described above, Zell stole PolyPeptide's library of confidential documents, containing PolyPeptide's most sensitive information that describe the proprietary manufacturing processes and quality systems that have made

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION
FOR TEMPORARY RESTRAINING ORDER.

PolyPeptide a global leader in pharmaceutical-grade peptide manufacturing. Zell's nefarious actions in stealing these documents and taking them to AmbioPharm, a PolyPeptide competitor, so as to replicate and incorporate PolyPeptide superior methods and systems, create a risk that he will disclose the confidential information or destroy evidence before the Court can consider this application. Zell is already employed by AmbioPharm and is tasked with performing essentially the same duties as he performed for PolyPeptide. Zell remains in possession of the USB storage devices containing PolyPeptide's Confidential Information and trade secrets. In view of these circumstances and the value of this case, the risks associated with giving Defendants notice of this application prior to issuing a temporary restraining order are too great. For these reasons, notice to Zell and AmbioPharm would be, at best, futile, and, at worst, result in further illicit activity.

## V.   CONCLUSION

For the reasons stated above, PolyPeptide respectfully requests that the Court issue a temporary restraining order to maintain the status quo and issue an order to show cause why a preliminary injunction should not be entered.

Dated: October 14, 2019                              **DUANE MORRIS LLP**

By: */s/ Boris Zelkind*
Boris Zelkind
Christopher M. Champine

Attorneys for Plaintiff
POLYPEPTIDE LABORATORIES, INC.